

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:FJN/SKW  
F. #2020R00809

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 30, 2022

<u>By ECF and E-mail</u>

The Honorable William F. Kuntz, II
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   <u>United States v. Jeremy Trapp</u>
             <u>Criminal Docket Nos. 20-308 and 20-454 (SJ)</u>

Dear Judge Kuntz:

      The government respectfully submits this response to the defendant's sentencing submission, <u>see</u> ECF No. 56, to correct the record.

      <u>First</u>, the defendant's claim that he fully complied with the requirements of his home detention is false. <u>See</u> Def. Ltr. at 15, 17. Attached to this letter as Government Exhibit A is a June 2022 memorandum which the United States Pretrial Services Agency ("Pretrial Services") drafted after the defendant last claimed in a court filing that he was fully compliant with the conditions of his pretrial release. <u>See</u> GX A. As Pretrial Services explained in the memorandum, the defendant repeatedly disconnected his location monitoring equipment, even after being reprimanded by his Pretrial Services Officer, and left his home at unauthorized times.

      The defendant also incorrectly claimed that his Pretrial Services Officer is the reason he did not obtain various employment. <u>See</u> Def. Ex A at 4. As indicated in Pretrial Services memorandum, however, Pretrial Services provided unusual flexibility to the defendant to assist him in gaining employment, but the defendant chose to discontinue his employment anyway. <u>See</u> GX A.

      Should the Court have any questions about the defendant's conduct while out on bond, Melissa Roman, the Supervising Pretrial Services Officer, is available to communicate with the Court.

Second, the defendant's repeated claim that he was "groomed, coached, prompted, directed, and coaxed" by others to commit these crimes, see Def. Br. at 2, 5, is plainly disproven by the defendant's own statements and the evidence in this case. As an initial matter, when asked at the plea allocution if defense counsel was aware of any viable legal defense to the charges, such as entrapment, defense counsel confirmed there were no viable legal defenses, as indicated below.

```
2          THE COURT:  Are you aware of any viable legal
3   defense to the charges?
4          MS. BURRELL:  No, Your Honor.
5          THE COURT:  All right.
6          Jeremy Trapp, what is your plea to the charge
7   contained in Indictment 20-CR-308, guilty or --
8          THE DEFENDANT:  Guilty.
```

See GX B (Plea Transcript). The defendant then proceeded to allocute as follows:

> During the summer of 2020, which that was last year, I applied for a loan from the Small Business, yes, the SBA. I filled out a paper work where I made false statements and representations about a car washing business. I received money in my bank account for this loan . . . I put in a false application. Like, I put in that I was -- that I had ten -- I had a maximum of ten employees, a gross of $150,000 that I -- that I -- that I lied about and applied for a loan. And then I got like 42,000, and then an extra 10,000 wired . . . On July 17th, 2020 I knowingly damaged an NYPD police van. I cut a wire underneath the van.

See id.

Despite this full allocation, the defendant's submission now incorrectly implies that the defendant's will was overtaken by others who convinced him to cut the brake line of a police vehicle and steal COVID-19 relief funds. This is not true. With respect to the defendant's decision to cut the brake line of a police vehicle, a Confidential Human Source ("CHS") first observed the defendant at a protest yelling at police. The CHS introduced himself to the defendant and the defendant quickly told the CHS that he thought all police were racist; that he had been involved in looting, property destruction, and burning

a police car in the past; and that he wanted to harm police officers.[1] Based on this concerning information, the CHS exchanged contact information with the defendant. Approximately three days later, the CHS met with the defendant again at which time the defendant stated that he wanted to cut the brake line of a police vehicle and burn the Verrazzano-Narrows Bridge.

For example, in a recorded conversation with the CHS on or about July 16, 2020, attached as GX C, the defendant made the following statements:

- "I'm down with credit card fraud, I'm down with robbing a bank, I'm down with all shit that will get me some money." (00:23)

- "Burn that bridge down, see that, how long that Verrazano bridge. Burn that shit down. All white supremacists will be stuck there." (8:27)

- "Its gonna sting them in the ass. My mom always told me hit them where it hurts the most." (10:02)

- "Now a cop car, you know what you do, cut their brakes off, put water or cut their brakes off. Either way, its two ways you could fuck up a cop car, burn it." (10:18)

- "We need to burn down the fucking precinct man." (10:44)

- "I want to burn down a precinct where it's far from my house and nobody knows me." (11:11)

- "If I were to go to Bay Ridge, I'm trying to fucking pop fucking cop car brakes. I'm trying to fuck up cop cars." (22:06)

- "On Friday, I wanna fuck up mad cop cars. All I gotta do is pop the breaks, that's it. Hit them where it hurts, fuck their brakes up." (22:13)

The next day, the CHS picked up the defendant at his home and the defendant had a scissor-like tool in his backpack which he subsequently used to cut a brake line of a police vehicle. The defendant was not prompted by the CHS to commit this crime. As indicated by his statements, the defendant made his own decision to engage in this dangerous conduct. Indeed, the CHS's presence is what enabled law enforcement officers to step in and prevent

---

[1] These statements are consistent with text messages found on the defendant's phone to individuals <u>other</u> than the CHS in which the defendant states, on or about July 14, 2020, that: "I'm fighting cops" and "we had war against nypd." The statements also are consistent with images found on the defendant's cell phone, dated June and July 2020, of the faces of various on duty, uniformed police officers and police vehicles.

3

the serious harm to the public that could have occurred had the defendant's conduct gone unnoticed.  As the Honorable Steven M. Gold noted when denying the defendant's first motion for bail, "it's hard to imagine a more potentially dangerous act than cutting the brake lines of any automobile, much less a police car that might find itself involved in high-speed activity, running through red lights with sirens on."  See GX D (Bail Hearing Transcript).

Similarly, the defendant's claim that his co-conspirator "coaxed" him to file a false COVID-19 relief application is untrue.  The text messages cited by the defendant show two co-conspirators discussing how to carry out a fraud against the United States.  While the defendant's co-conspirator may have understood the mechanics of filling the application, the defendant fully understood the scope of the fraud, provided his personal information to include in the fraudulent application, was present at the time his co-conspirator submitted the fraudulent application, and received the bulk of the proceeds from the fraud.

*     *     *

In short, instead of fully owning up to his conduct, the defendant has blamed everyone else for his behavior: his mother, Pretrial Services, the CHS, and his co-conspirator.  The government respectfully submits that the defendant's notable failure to accept responsibility for his criminal behavior is a factor the Court should consider under Section 3553(a) when sentencing the defendant.

    Respectfully submitted,

    BREON PEACE
    United States Attorney

By:   /s/ Sara K. Winik
    Francisco J. Navarro
    Sara K Winik
    Assistant U.S. Attorneys
    (718) 254-7000

cc:   Clerk of the Court (WFK) (by ECF)
    Leticia Olivera, Esq. (by ECF)
    Erica Vest, U.S. Probation Officer (by e-mail)